1
2
3
4
5
6
7
8
9
10
11
12
13
14

Leiv Blad, Bar. No. 151353
leiv@competitionlawpartners.com
Jeffrey Blumenfeld (*pro hac vice forthcoming*)
jeff@competitionlawpartners.com
Meg Slachetka (*pro hac vice forthcoming*)
meg@competitionlawpartners.com
COMPETITION LAW PARTNERS PLLC
1101 Pennsylvania Ave., NW
Washington, DC 20004
Telephone: (202) 742-4300
Facsimile: (202) 810-9815

Don Bivens
don@donbivens.com
Teresita Mercado
teresita@donbivens.com
Don Bivens PLLC
15169 N. Scottsdale Road
Suite 205
Scottsdale, AZ 85254
Telephone: (602) 708-1450

*Attorneys for Plaintiffs*

15
16

### UNITED STATES DISTRICT COURT
### FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL FRANK and LAKSHMI NAGIREDDI, <br><br> on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> YARDI SYSTEMS, INC., GREYSTAR REAL ESTATE PARTNERS, LLC, LINCOLN PROPERTY COMPANY, ASSET LIVING, CUSHMAN & WAKEFIELD PLC, FPI MANAGEMENT, RPM LIVING, APARTMENT MANAGEMENT CONSULTANTS LLC, | Case No.: 8:24-CV-617 <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

17
18
19
20
21
22
23
24
25
26
27
28

1   BH MANAGEMENT SERVICES,
2   WINNCOMPANIES, AVENUE5
    RESIDENTIAL, 10 FEDERAL
3   COMPANIES, BALACIANO GROUP,
    and RAM PARTNERS, LLC,
4

5                                    Defendants.
6

7

8           Plaintiffs Daniel Frank and Lakshmi Nagireddi bring this action against Yardi
9   Systems, Inc. ("Yardi"), Greystar Real Estate Partners, LLC ("Greystar"), Lincoln
10  Property Company ("Lincoln"), Asset Living, Cushman & Wakefield plc
11  ("Cushman & Wakefield"), FPI Management ("FPI"), RPM Living ("RPM"),
12  Apartment Management Consultants LLC ("Apartment Management Consultants"),
13  BH Management Services ("BH"), WinnCompanies, Avenue5 Residential
14  ("Avenue5"), and 10 Federal Companies ("10 Federal"), Balaciano Group
15  ("Balaciano"), and RAM Partners, LLC ("RAM Partners") (collectively,
16  "Defendants"), under Section 1 of the Sherman Act on behalf of themselves and all
17  others similarly situated. Yardi develops property management software for
18  managers ("Landlords") of Mid-Range and High-End multifamily real estate units
19  ("Apartments"), as Yardi defines those terms, across the nation. Defendants other
20  than Yardi are Landlords of Apartments.
21          The Defendants all participate in a nationwide price-fixing scheme. Using
22  Yardi's aptly named "RENTmaximizer" service,[1] Defendants increase rental rates
23  at least 6% above what rates would be if the Landlords were competing instead of
24  colluding and boast about that success. The Landlords (a) give their competitively
25  sensitive pricing data to Yardi which, as they know, Yardi uses to calculate rental
26

27  _____
28  [1] Perhaps realizing that the name revealed too much, Yardi later changed the name of the service
    to "Revenue IQ." This Complaint uses "RENTmaximizer" to denominate the Yardi service and
    software at issue whether it was named RENTmaximizer or Revenue IQ at the time.

rates for each Landlord, and (b) agree not to compete on price. Yardi thus enables the Landlords to share pricing data for the purpose of colluding on the prices that each will charge, which the Landlords admit is more than what they would charge were they to set prices unilaterally. Indeed, Yardi *guarantees* Landlords that their revenues will increase at least 6% if they join the conspiracy.

The appeal of Yardi's "service" is simple: it takes the work out of price fixing by offering Landlords the opportunity to collude on price without ever having to negotiate terms or exchange prices directly with their horizontal competitors. By giving their most confidential pricing data to Yardi and agreeing to use the prices that Yardi sets based on that data, the Landlords agree to fix prices based on the prices Yardi sets.

Once Landlords join the conspiracy Yardi organizes local and regional meetings at which it encourages Landlords to refine and improve their collusion. To "facilitate the exchange of information" among Landlords, "Yardi encourages the development of active local User Groups." Yardi advises Landlords that these User Groups help Landlords exchange information, experiences, and ideas. Tellingly, Yardi hides from public scrutiny the names of the Landlords that are members of these User Groups as well as the time and location of the groups' meetings of the groups.

The key feature of Defendants' price fixing scheme is the agreement that instead of 10 or 15 or 20 Landlords in a market each setting its own rental rates based on imperfect market knowledge, they have all agreed to empower a single entity—Yardi—to set rates for all Landlords based on the perfect market information the Landlords collectively provide to Yardi. The only alternative means to accomplish the same result would be for all the participating Landlords to merge so that a single entity or person would set rental prices for all of them. Such a merger obviously would be illegal, not least because it would give the consolidated Landlord the power to raise price by 6%. That the Defendants admit—and boast—that they

collectively have that market power by agreement makes it obvious that their scheme is *per se* unlawful.

The result of this blatantly illegal conduct is a windfall for the Defendants and artificially higher prices for individuals and families in cities and suburbs across this country that lease Apartments from Landlords. This modern take on old-fashioned price fixing is illegal not because Yardi allegedly employs an algorithmic pricing tool. Whether Yardi uses an algorithm or an abacus to calculate lease prices is immaterial. It is illegal because the Landlords provide competitively sensitive pricing information to Yardi, which Yardi uses to set lease prices the Landlords then impose on their tenants. This suppresses the price competition that would benefit renters and raises rental prices in each market.

Plaintiffs seek to end this unlawful price-fixing conspiracy and to restore competition to Apartment Markets throughout this country by this action for treble damages and injunctive relief.[2] Plaintiffs demand a jury trial.[3]

# I.    INTRODUCTION

1.    Americans increasingly live in apartments. According to the United States Census, 35% of households live in rented structures and 64% of those households live in apartments. Not surprisingly, apartment living has become especially popular in urban and suburban areas. As apartment living has become

---

[2] The term "Apartment Market" is further defined in paragraphs 79-85, *infra*.

[3] This is the third action against Landlords and their pricing coordination. Pending in the United States District Court for the Middle District of Tennessee is multi-district litigation against RealPage, Inc. and a different group of property owners and managers. Yardi is not a party in that litigation, which is in discovery following a partial denial of a Rule 12(b)(6) motion to dismiss. The second action is against Yardi and a group of property owners and managers pending in the United States District Court for the Western District of Washington. The parties there have briefed the Defendants' Rule 12(b)(6) motion to dismiss. That action differs from this one in that this action names different Defendants and does not allege that the Defendants' use of algorithmic pricing violates Section 1 of the Sherman Act. This action alleges that the unlawful price fixing is the sharing of competitively sensitive data for the purpose of allowing Yardi to use that confidential data to set the rental prices well above those that would exist in a competitive market which the Landlords then impose on their tenants.

more prevalent, the business of apartment management has become increasingly concentrated among the largest 50 Landlords.

2.      These developments have made Apartment Markets ripe for unlawful collusion among Landlords. Yardi has taken advantage of these changes by developing a method to enable collusion among Landlords across the country while sharing in the windfall of the resulting supracompetitive pricing. The flip side of Defendants' windfall is that renters are paying ever more of their incomes on living space.

3.      In a competitive Apartment Market, each Landlord sets its own rental terms and competes for renters based on price, among other factors. To compete on price each Landlord offers a combination of various price-related terms including the stated monthly rental price, up-front discounts, and length-of-lease discounts, among other incentives and elements.

4.      Because Landlords in a competitive market act unilaterally, each Landlord has imperfect knowledge about its competitors' operational details, including their rental prices. This uncertainty means each Landlord fears that its prices may be too high to attract tenants. The result is lower prices as competing Landlords vie for tenants.

5.      That is how Apartment Markets operated prior to Yardi's strategy to enable collusive pricing among Landlords. Before Yardi, the barriers to Landlord collusion were formidable: Apartment Markets are local, not national, and demand for Apartments within local markets depends on several factors, including price, location, size, layout, etc.

6.      Landlords did not have the scale to organize a national price-fixing conspiracy that would raise prices in each market. They generally did not operate across multiple Apartment Markets, and they knew that raising price in any one market risked price competition from Landlords in that Apartment Market as well as adjacent Apartment Markets.

7. Yardi had the structure and the scale to do what the Landlords could not do themselves—empower a nationwide price-fixing conspiracy. Yardi was a national company delivering management software to Landlords throughout the country who essentially outsourced to Yardi many of the back-office services the Landlords historically had performed themselves. It did not take much effort for Yardi to transform that business into a national conduit for price fixing among Landlords.

8. Beginning in 2011, Yardi expanded its services to include "RENTmaximizer," a software package it advertised as a "transparent revenue management system." Using RENTmaximizer, Landlords give their competitively sensitive price information to Yardi, which then uses that information to organize market-wide lease pricing that eliminates price competition and maximizes the Landlords' profits. Yardi thus transforms each Landlord's "imperfect" knowledge of its competitors' pricing into literally "perfect" knowledge.

9. RENTmaximizer has three components. *First*, Yardi's agreement with Landlords requires them to provide Yardi with their most competitively sensitive information, including rental prices, unit type, and current occupancy status. Yardi combines all this confidential information from Landlords in a detailed database (the "Yardi Database") that gives it perfect visibility into each local market.

10. *Second*, each Landlord agrees to allow Yardi to set the prices for the Landlord's Apartment leases based on the shared competitively sensitive information in the Yardi Database. Armed with this perfect information Yardi determines lease prices far above the prices that the Landlords—armed with only imperfect information—would charge in the same market, and the Landlords use those to price its leases. This is the Yardi guarantee: each Landlord knows that its leases—and leases of Landlords with which it no longer competes thanks to Yardi— are priced higher than the rates the Landlord would have set had it priced the leases unilaterally in a competitive market.

11.    *Third*, by agreeing to allow Yardi to price leases using the Yardi Database, each Landlord agrees with the other Landlords not to compete based on price. While the Landlords retain the theoretical authority to change the prices Yardi recommends, the Landlords rarely, if ever, do so in any material way. Indeed, the Landlords happily have proclaimed that Yardi's pricing has taken the uncertainty and guesswork—as the Landlords put it, the fear factor that makes for competition—out of their lease pricing.

12.    What is more, Yardi provides "Revenue Managers"—Yardi personnel—to help the Landlords implement and maintain the prices Yardi sets. Landlords have repeatedly lauded Yardi's Revenue Managers as important aides in ensuring they charge the prices Yardi sets.

13.    RENTmaximizer gives Yardi a very different incentive and ability in pricing compared to each Landlord acting individually. Rather than lowering prices to meet competition, as each Landlord would do in a competitive market, Yardi has the information necessary to maximize the rent of each Apartment, "push[ing] rents without sacrificing occupancy, [by] eliminat[ing] the fear factor of exposure that is a natural concern for property and regional managers" in a functioning competitive market.[4] And far from performing this rent maximizing function behind the scenes, Yardi makes the fact and success of its illegal scheme the cornerstone of its marketing.

14.    RENTmaximizer has become a key feature in Apartment Markets across the country. Almost all the largest Landlords use RENTmaximizer, including more than 13,000 real estate companies managing Apartments reaping more than $5 billion in monthly rent.

15.    RENTmaximizer is so effective that Yardi can guarantee each Landlord that its rental income will increase by 6% or more *over the revenue the Landlord*

---

[4] https://www.businesswire.com/news/home/20170616005099/en/Beztak-Grows-Rental-Income-with-Yardi-RENTmaximizer

*would have earned had it set its own prices in a competitive market.* Yardi can offer that guarantee only because it knows that its agreements with Landlords replaces the competition that would have reduced prices with the collusion that raises prices. Instead of dozens or hundreds of landlords competing for renters based on price, a single entity—Yardi—determines the price for all Landlords. This eliminates all price competition among these Landlords.

16.     The result of Yardi-enabled price collusion using RENTmaximizer has been just as Yardi promised and has contributed to rising Apartment prices nationally. Beginning in 2012—just one year after the launch of RENTmaximizer— monthly median asking rent increased from $1,090 to $1,286 according to the United States Census, an increase of 18%, even though the inflation rate fell from 2.9% to 1.5%. That figure had increased to $1,874 by the end of 2022, an increase of 72% in a decade.

17.     The astonishing thing is that Yardi did not even attempt to hide the collusion it orchestrated. Far from it.  In press release after press release, Yardi proudly announced that its Landlord customers were increasing Apartment rents faster than their non-Yardi-organized competitors while maintaining or even increasing occupancy rates.

18.     The Defendants' unlawful price fixing increases the prices tenants pay and violates Section 1 of the Sherman Act. Plaintiffs and other Apartment renters like them who have been forced to pay supracompetitive rents bring this action to end the price collusion Yardi has created and to recover damages, trebled, and other appropriate relief. Plaintiffs demand a jury trial.

## II.     THE PARTIES

19.     Plaintiff Daniel Frank is a resident of Peachtree Corners, Georgia. He rents an apartment from Defendant RAM Partner.

20.     Plaintiff Lakshmi Narigeddi is a resident of Anaheim, California. He rents an apartment from Defendant Greystar.

21.    Yardi is a California corporation headquartered in Goleta, California. Yardi licenses and supplies property management software and services to owners and managers of multifamily residential units.

22.    Greystar is headquartered in Charleston, South Carolina. Greystar provides apartment management services and is a client of Yardi's RENTmaximizer. Greystar is the largest Landlord in the United States. Greystar has entered a contract with Yardi, and pursuant to that contract has provided its competitively sensitive pricing information to Yardi knowing that Yardi would use that data to set lease prices for Apartments in which Greystar operates. Greystar has adopted Yardi's pricing in its own lease prices and imposed those unlawful prices on members of the class.

23.    Lincoln is headquartered in Dallas, Texas. Lincoln provides apartment management services and is a client of Yardi's RENTmaximizer. Lincoln is the second largest Landlord in the United States. Lincoln has entered a contract with Yardi, and pursuant to that contract has provided its competitively sensitive pricing information to Yardi knowing that Yardi would use that data to set lease prices for Apartments in which Lincoln operates. Lincoln has adopted Yardi's pricing in its own lease prices and imposed those unlawful prices on members of the class.

24.    Asset Living is headquartered in Houston, Texas. Asset Living provides apartment management services and is a client of Yardi's RENTmaximizer. Asset Living is the third largest Landlord in the United States. Asset Living has entered a contract with Yardi, and pursuant to that contract has provided its competitively sensitive pricing information to Yardi knowing that Yardi would use that data to set lease prices for Apartments in which Asset Living operates. Asset Living has adopted Yardi's pricing in its own lease prices and imposed those unlawful prices on members of the class.

25.    Cushman & Wakefield is a United Kingdom company with its United States headquarters in Chicago, Illinois. Cushman & Wakefield is an international

real estate company that provides apartment management services in the United States and is a client of Yardi's RENTmaximizer. Cushman & Wakefield is the fourth largest Landlord in the United States. Cushman & Wakefield has entered a contract with Yardi, and pursuant to that contract has provided its competitively sensitive pricing information to Yardi knowing that Yardi would use that data to set lease prices for Apartments in which Cushman & Wakefield operates. Cushman & Wakefield has adopted Yardi's pricing in its own lease prices and imposed those unlawful prices on members of the class.

26. FPI is headquartered in Folsom, California. FPI provides apartment management services and is a client of Yardi's RENTmaximizer. FPI is the fifth largest Landlord in the United States. FPI has entered a contract with Yardi, and pursuant to that contract has provided its competitively sensitive pricing information to Yardi knowing that Yardi would use that data to set lease prices for Apartments in which FPI operates. FPI has adopted Yardi's pricing in its own lease prices and imposed those unlawful prices on members of the class.

27. RPM is headquartered in Austin, Texas. RPM provides apartment management services and is a client of Yardi's RENTmaximizer. RPM is the sixth largest Landlord in the United States. RPM has entered a contract with Yardi, and pursuant to that contract has provided its competitively sensitive pricing information to Yardi knowing that Yardi would use that data to set lease prices for Apartments in which RPM operates. RPM has adopted Yardi's pricing in its own lease prices and imposed those unlawful prices on members of the class.

28. Apartment Management Consultants is headquartered in Salt Lake City, Utah. Apartment Management Consultants provides apartment management services and is a client of Yardi's RENTmaximizer. Apartment Management Consultants is the seventh largest Landlord in the United States. Apartment Management Consultants has entered a contract with Yardi, and pursuant to that contract has provided its competitively sensitive pricing information to Yardi

knowing that Yardi would use that data to set lease prices for Apartments in which Apartment Management Consultants operates. Apartment Management Consultants has adopted Yardi's pricing in its own lease prices and imposed those unlawful prices on members of the class.

29.     BH is headquartered in Des Moines, Iowa. BH provides apartment management services and is a client of Yardi's RENTmaximizer. BH is the eighth largest Landlord in the United States. BH has entered a contract with Yardi, and pursuant to that contract has provided its competitively sensitive pricing information to Yardi knowing that Yardi would use that data to set lease prices for Apartments in which BH operates. BH has adopted Yardi's pricing in its own lease prices and imposed those unlawful prices on members of the class.

30.     WinnCompanies is headquartered in Boston, Massachusetts. WinnCompanies provides apartment management services and is a client of Yardi's RENTmaximizer. WinnCompanies is the ninth largest Landlord in the United States. WinnCompanies has entered a contract with Yardi, and pursuant to that contract has provided its competitively sensitive pricing information to Yardi knowing that Yardi would use that data to set lease prices for Apartments in which WinnCompanies operates. WinnCompanies has adopted Yardi's pricing in its own lease prices and imposed those unlawful prices on members of the class.

31.     Avenue5 is headquartered in Seattle, Washington. Avenue5 provides apartment management services and is a client of Yardi's RENTmaximizer. Avenue5 is the tenth largest Landlord in the United States. Avenue5 has entered a contract with Yardi, and pursuant to that contract has provided its competitively sensitive pricing information to Yardi knowing that Yardi would use that data to set lease prices for Apartments in which Avenue5 operates. Avenue5 has adopted Yardi's pricing in its own lease prices and imposed those unlawful prices on members of the class.

32.    10 Federal is headquartered in Raleigh, North Carolina. 10 Federal provides apartment management services and is a client of Yardi's RENTmaximizer. 10 Federal has entered a contract with Yardi, and pursuant to that contract has provided its competitively sensitive pricing information to Yardi knowing that Yardi would use that data to set lease prices for Apartments in which 10 Federal operates. 10 Federal has adopted Yardi's pricing in its own lease prices and imposed those unlawful prices on members of the class.

33.    Balaciano is headquartered in Los Angeles, California. Balaciano provides apartment management services and is a client of Yardi's RENTmaximizer. Balaciano has entered a contract with Yardi, and pursuant to that contract has provided its competitively sensitive pricing information to Yardi knowing that Yardi would use that data to set lease prices for Apartments in which Balaciano operates. Balaciano has adopted Yardi's pricing in its own lease prices and imposed those unlawful prices on members of the class.

34.    RAM Partners is headquartered in Atlanta, Georgia. RAM Partners provides apartment management services and is a client of Yardi's RENTmaximizer. RAM Partners has entered a contract with Yardi, and pursuant to that contract has provided its competitively sensitive pricing information to Yardi knowing that Yardi would use that data to set lease prices for Apartments in which RAM Partners operates. RAM Partners has adopted Yardi's pricing in its own lease prices and imposed those unlawful prices on members of the class.

35.    Other persons, firms, and corporations not named as Defendants have participated as co-conspirators with Defendants and have performed acts in furtherance of the conspiracy.

## III.    JURISDICTION AND VENUE

36.    This Court has subject matter jurisdiction of these claims under 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

37.    This Court has personal jurisdiction over the Defendants under Section 12 of the Clayton Act, 15 U.S.C. § 22.

38.    Defendants' conduct was within the flow of and was intended to and did have a direct and substantial effect on the interstate commerce of the United States, including in this District.

39.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 and Section 12 of the Clayton Act, 15 U.S.C. § 22, because Yardi is headquartered in this District, a substantial part of the alleged events giving rise to the claims occurred, and a substantial portion of the affected interstate trade and commerce described below was carried out, in this District.

## IV.    FACTUAL BACKGROUND

40.    The appeal of Yardi's "service" to Landlords is simple: it takes the work out of price fixing by offering the opportunity to collude on price without ever having to negotiate terms or exchange prices directly with their horizontal competitors. By giving their most confidential pricing data to Yardi and agreeing to use the prices that Yardi sets based on that data, the Landlords agree with each other to fix prices based on the prices Yardi sets.

41.    The corollary agreement among the Landlords is that they will not compete against each other based on price. By agreeing to let Yardi set their prices— by outsourcing their pricing decisions to Yardi—Landlords relinquish their ability and legal obligation to compete on price in favor of Yardi setting price across all the participating Landlords in a way that increases the revenue of all Landlords. This is the opposite of competition—it is cooperation. Indeed, replacing competition with cooperation is the whole point of Yardi's price-fixing scheme. No Landlord would

unilaterally increase rental prices unless it knew that its competitors would match its price. Otherwise, any increase would risk losing business to other Landlords trying to win the business by offering lower prices, the essence of competition.

42. The Defendants' price-fixing scheme leads to a virtuous cycle for them, but a vicious cycle for renters: reduced competition among Landlords leads to higher prices for renters, higher revenue for Landlords, and more profit for Yardi.

43. It is an understatement to say that Defendants have admitted these facts. In numerous press releases, Yardi and the Landlords have reported gleefully that the price-fixing scheme had changed the Landlords' pricing policies and increased the Landlords' rental revenue per Apartment. The Defendants have admitted that by providing Yardi with confidential pricing data and following Yardi's "recommended" rental prices based on that confidential pricing data collected in the Yardi Database, the Landlords had increased revenue by at least 6%, eliminated the "uncertainty" and "guesswork" in rental pricing, and brought pricing "stability" to Apartment Markets.[5]

44. That is the essence of an unlawful price-fixing agreement. For those reasons the Defendants' pricing scheme violates Section 1 of the Sherman Act.

A. The Landlords Provide Their Competitively Sensitive Pricing Data to Yardi

45. The Landlords could not lawfully coordinate their pricing based on sharing their competitively sensitive information. Yet, that is precisely what Yardi enables them to do.

46. In each Landlord's agreement with Yardi, the Landlord agrees to provide Yardi with its confidential data. It is difficult to overstate the comprehensiveness of the confidential data Landlords provide to Yardi, including

---

[5] Yardi's price recommendations also provide a starting point for the Landlords' pricing, meaning that each Landlord knows that it and all the other Landlords in a market start from the same reference point.

the granular details of the most competitively sensitive and proprietary information about the Landlords' Apartment units, such as "rental income, concessions, occupancy and rental rates."[6] As Yardi accumulates confidential data in a particular market, it develops the Yardi Database, complete with the most minute detail about Apartment units in an Apartment Market.

47.    Yardi has admitted that each Landlord provides its operational details, including the Landlord's proprietary pricing data. What is more, each Landlord knows Yardi will use the Landlord's proprietary data in setting prices for all the Yardi Landlords. Indeed, that is why the scheme works and why Landlords join it. Yardi brags that the Yardi Database gives each Landlord "complete visibility" into market pricing—meaning into each other's pricing—replacing each Landlord's previously imperfect information with perfect information.

48.    Yardi also tells Landlords explicitly that the Yardi Database allows a Landlord to benchmark its pricing against every other Yardi Landlord in the Apartment Market: "With this transparent system you will see everything from rental rates and occupancy data to property performance benchmarking (compared to the market, submarket and competition)."[7]

49.    Because the Landlords know that their pricing from Yardi is pegged to the pricing of every other Landlord in the Apartment Market, the result is that each Landlord "enjoy[s] greater confidence that you are delivering the best possible rental prices." And there is no ambiguity as to what "best" means: to Defendants, "the best possible rental prices" means the highest possible price—not the most competitive price.

50.    The Yardi Database is so comprehensive that Yardi can generate a near-real-time Unit Pricing Report ("UPR") at any time for a Landlord. The UPR

---

[6] https://www.yardi.com/products/yardi-revenue-iq/
[7] https://resources.yardi.com/documents/elevate-suite-for-multifamily-brochure/

COMPLAINT

recommends pricing for a particular Landlord based on competitor pricing in an Apartment Market for a specific unit type (*e.g.*, number of bedrooms and bathrooms). The Yardi Database is so detailed, and the resulting Yardi pricing so sensitive to movements in a particular Apartment Market, that the UPR "is only valid for the current day (until midnight) not twenty-four (24) hours." To avoid any doubt, Yardi makes clear that the time limits for its pricing "recommendations" are remarkably strict. Yardi's User Manual warns Landlords that a recommendation Yardi provides for a prospective tenant on one morning is no longer operative by the morning of the next day.

51.     Yardi has admitted the substantial economic value of access to the Yardi Database:

> This data delivers accurate indicators of economic trends and performance and helps you price apartments profitably. When this market-specific data is incorporated with your RENTmaximizer data, you can accurately benchmark performance and factor it into rent projections and calculations which enhances your revenue management strategy and helps boost the performance of individual assets.[8]

**B.      The Yardi Database Enables Landlords to Coordinate Their Rental Pricing**

52.     Instead of pricing rental units unilaterally to entice renters, each Landlord agrees to outsource setting its rental prices to Yardi. As Yardi explains in its marketing materials, "You manage your business, we manage your pricing."

53.     Yardi agrees with the Landlords that it will set prices for the Landlords' Apartment units using information in the Yardi Database, which consists of the proprietary and confidential operational data each Landlord provides as part of the RENTmaximizer agreement and which includes "everything from rental rates and

---

[8] https://resources.yardi.com/documents/elevate-suite-for-multifamily-brochure/

occupancy data to property activity and benchmarking."[9] Most importantly, Yardi promises to compare the Landlord's granular detail to that of its competitors "in real time—including every comp and how you compete."[10] Thus, Yardi effectively provides each Landlord with the comprehensive market-wide competitive data and analysis—and decisions on pricing—that the Landlords could accomplish on their own only by doing the hard work of price fixing themselves: sharing the information and agreeing on pricing directly, the essence of the classic "smoke-filled room" price-fixing conspiracy.

54. Using the Yardi Database, Yardi promises to do something else a Landlord could not do alone: "[p]rice leases to optimize [both] revenue and occupancy."[11] According to Yardi, this will "[d]rive revenue with clear, comprehensive metrics leveraging operational components including rental income, concessions, occupancy and rental rates—not just pricing."[12]

55. Indeed, Yardi boasts that it will adjust pricing daily "based on market conditions and your inventory" and provide "daily management reports to understand pricing changes based on availability, demand and competition."[13] Yardi prices each Landlord's leases using the broad array of competitively sensitive data on the pricing of its competitors, data that is not available to any individual Landlord: "Leases are priced by the system daily, which allows for fast adjustment to market conditions and changes in your inventory and traffic, while adjusting for cost constraints such as vacancy loss, turnover costs, inventory hold days and lease expiration management."[14]

---

[9] https://resources.yardi.com/documents/revenue-iq-brochure/.
[10] https://www.yardi.com/products/yardi-revenue-iq/.
[11] https://resources.yardi.com/documents/revenue-iq-brochure/.
[12] https://www.yardi.com/products/yardi-revenue-iq/
[13] *Id.*
[14] *Id.*

56.    Finally, Yardi guarantees Landlords that join the conspiracy that their prices will be 6% above the prices the Landlords would have charged had they set prices on their own without the benefit of perfect knowledge of what their competitors were doing. Yardi states flatly that the Landlords will "[b]eat the market and gain an average 6% net rental income growth while improving occupancy."[15] Yardi promises Landlords that its pricing system will allow the Landlord to "[c]onsistently beat the market by utilizing revenue management instead of pricing yourself."[16] This boast is an admission that Yardi's contracts with the Landlords accomplish the goals of every price-fixing conspiracy: increasing the prices renters pay over what would prevail in a competitive market—*i.e.*, one in which the Landlords set rental prices unilaterally.

## C.    Yardi's Revenue Managers Manage the Landlords' Pricing

57.    Yardi provides Landlords with Revenue Managers—Yardi employees that work with Landlords to coordinate pricing more efficiently. Yardi's description of the role of the Revenue Manager makes this clear:

> ***You manage your business, we manage your pricing****.* Only Yardi provides you with a dedicated revenue manager with valuable industry experience along with your revenue management software. Your dedicated revenue manager will get to know your business processes, assets and goals to provide superior support and will work with you to maximize your returns. And as a RENTmaximizer client, you'll receive this service and training continuously to promote ongoing success. (emphasis added)[17]

---

[15] *Id.*

[16] https://www.yardielevate.com/multifamily/revenue-iq/.

[17] https://resources.yardi.com/documents/elevate-suite-for-multifamily-brochure/

COMPLAINT

58.     The Revenue Managers allow Landlords to "[r]ely on a dedicated Yardi expert to help manage pricing."[18] More specifically, the Revenue Managers provide "pricing recommendations *and control pricing at the property level*."[19]

59.     The Revenue Managers are another mechanism by which Yardi helps perfect price collusion among Landlords. The Revenue Managers help ensure that Landlords use Yardi's "recommended" prices and make the price increases stick despite pushback from tenants and property owners. For example, Michael Hankin, Chief Operating Officer for Hankin Group, expressed gratitude to the Revenue Managers for their help in increasing Hankin's prices and therefore its revenue: "Thanks to Yardi RENTmaximizer, which works seamlessly with our Yardi … property management and accounting platform [software], our site managers no longer have to manually figure out competitive rents in their markets. After only 90 days using Yardi RENTmaximizer, we've seen an effective rent growth of 5%."[20] Hankin specifically thanked the contribution and analysis from the Revenue Managers: "We really appreciate the support we get from the Yardi RENTmaximizer team—including weekly pricing calls with our dedicated revenue management expert. It's so advantageous to have their analysis and input on how we are pricing our properties relative to our markets and business goals."[21] Hankin referred to the Revenue Managers as his company's "safety net."[22]

60.     Adam Goldfarb, vice president for Landlord Manco Abbott admitted that the Revenue Manager "can dig deeper to support our pricing—and that gives our organization and clients great confidence."[23] Ironically, "great confidence"

---

[18] *Id*.

[19] *Id*. (emphasis added).

[20] https://media.whatcounts.com/sitestuff_yardi/2015_q2_mf/hankin.html.

[21] *Id*.

[22] *Id*.

[23] *Manco Abbott Inc. Achieves Rental Growth, Gains Expert Pricing Insight with Yardi RENTmaximizer*, Business Wire (Nov. 10, 2015), https://www.businesswire.com/news/home/20151110005039/en/

means the belief by the Landlord that Yardi's price increases will stick despite protests by individual tenants.

### D. Defendants' Price-Fixing Scheme Raises Rental Prices Above a Competitive Level

61.     Yardi itself has represented to Landlords that its pricing system allows Landlords to manage the supply of Apartment space to maximize rental income, which is important in a market with decreasing demand. In a promotional video posted on Facebook, Yardi boasted that RENTmaximizer allowed Landlords to grow rental income by more than 6% per year "while maintaining or improving occupancy." Yardi represented that its system was able to achieve these improbable results by analyzing "operational data" from competing Landlords so that the Landlord could respond quickly to pricing changes at comparable Apartments.

62.     Landlords have not been shy about lauding Yardi for allowing them to raise rental prices, eliminate discounts, and remove all uncertainty—meaning competition—from the pricing process.

63.     According to Mike Leja, Yardi administrator for Landlord Singh Management, "We've been using Yardi RENTmaximizer for five months and we're already experiencing amazing results compared to the properties in our portfolio not yet using the system — our revenue is consistently higher for the Yardi RENTmaximizer properties. After the first month, the Yardi RENTmaximizer properties were performing at 7% higher, and by the fifth month, they reached rental growth of 18.5%." Leja added, "Even some high-occupancy properties achieved an average 10% occupancy jump using Yardi RENTmaximizer."[24]

64.     In 2016, Caroline Kane, Chief Executive Officer of CKR Property Management in Houston, said that, since implementing RENTmaximizer, "our

---

[24]     https://www.businesswire.com/news/home/20160223005007/en/Singh-Management-Gains-Revenue-and-Occupancy-Growth-with-Yardi-RENTmaximizer

rental revenue is up 8% year over year."[25] According to the Bureau of Labor Statistics ("BLS"), the inflation rate in 2016 ranged from 0.8% to 2.1%, meaning that Yardi's system allowed CKR to raise rental prices by more than four times the rate of inflation.

65. Similarly, in December 2017, Sam Foster, Chief Executive Officer of Philadelphia-based Landlord PRG Real Estate, said that since adopting RENTmaximizer in 2016, PRG's rental income had increased 19%, more than seven times the rate of inflation.[26]

66. Sarah Oglesby-Battle, executive vice president of Landlord Beztak Companies' management division, admitted that Yardi's system allowed Beztak to "push[] rents without sacrificing occupancy, which gives our staff confidence [and] eliminates the fear factor of exposure that is a natural concern for property and regional managers."[27]

67. Brad Minsley, co-owner of Defendant Landlord 10 Federal, admitted that Yardi's system allowed 10 Federal to raise prices and maintain occupancy rates above its competitors: "Yardi RENTmaximizer allows us to react much more dynamically in our pricing for down-trending markets and still maintain a 94 percent rate of pre-leased units, while our competitors are generally seeing about 70 percent." Minsley gushed that because of "Yardi RENTmaximizer we are signing new leases, our renewal rates are sustainable, and we don't have to offer concessions."[28]

---

[25] https://www.businesswire.com/news/home/20161027005063/en/CKR-Property-Management-Grows-Rental-Revenue-Yardi
[26] https://www.businesswire.com/news/home/20171214005468/en/PRG-Real-Estate-Sees-Double-Digit-Rent-Growth
[27] https://www.businesswire.com/news/home/20170616005099/en/Beztak-Grows-Rental-Income-Yardi-RENTmaximizer
[28] https://www.businesswire.com/news/home/20150727005133/en/10-Federal-Increases-Rental-Income-with-Yardi-RENTmaximizer-Optimizes-Investor-Reporting-with-Yardi-Orion-Business-Intelligence

68.     Philip Nored, owner and managing partner of Landlord HNN Associates LLC, admitted that Yardi had removed all uncertainty from the pricing process: "RENTmaximizer has taken the guesswork out of our rental pricing and lease terms, and boosts pricing performance through an intelligent system of measurements, fixed factors and discipline."[29] "Guesswork" of course is another term for the uncertainty that drives competitive pricing.

69.     Yardi bragged that Landlord Bridge Property Management used RENTmaximizer to increase rental income "9.4% year-over-year same store rental income growth for properties priced with Yardi RENTmaximizer (Q1 and Q2 2015 vs. Q1 and Q2 2014)."[30] According to BLS, the highest inflation rate in 2014 and 2015 was only 2.1%, meaning that RENTmaximizer allowed Bridge Property Management to raise rental prices at more than four times the rate of inflation. According to Terri Dowen, Yardi's senior vice president of sales, Bridge Property Management increased its occupancy rate at the same time it increased price so dramatically,[31] a feat impossible in a competitive market absent market power or illegal price fixing.

70.     Yardi highlighted the experience of Landlord DEELS Properties, which had "achieved significant rental income gains using Yardi RENTmaximizer for its apartment communities in Los Angeles." Yardi admitted that these results were possible only because Yardi's system allowed DEELS to achieve a level of "transparency" that gave it insight into the pricing and operation details of its competitors. Ms. Dowen called this a "true competitive edge."[32] DEELS is now Defendant Balaciano.

---

[29]     https://www.businesswire.com/news/home/20150217005101/en/HNN-Associates-LLC-Optimizes-Rental-Pricing-Performance-with-Yardi-RENTmaximizer

[30]     https://www.businesswire.com/news/home/20150929005288/en/Bridge-Property-Management-Gains-9.4-Year-Over-Year-Rental-Growth-with-Yardi-RENTmaximizer

[31] *Id*.

[32]     https://www.businesswire.com/news/home/20180226005236/en/DEELS-Properties-Results-Yardi-RENTmaximizer

71. Amanda McHugh of the Rockbridge Group, noted that RENTmaximizer allowed her company to "achieve[] an average 48% increase in gross potential rent, even at properties undergoing renovations." As Yardi admitted, this was because Yardi's system "take[s] the guesswork [*i.e.*, the force that drives competition] out of pricing." Ms. McHugh agreed: "Thanks to RENTmaximizer, we have eliminated all concessions and specials. We have even renewed some leases at market rate." Ms. Dowen made this even more explicit: "By automating rental pricing that factors in portfolio and market data, RENTmaximizer not only improves rental income while maintaining occupancy, it simplifies the process by eliminating rent rate guesswork and traditional sales devices such as concessions and specials."[33]

**E.      Defendants' Price-Fixing Scheme Also Has Harmed Consumers in Other Lease Terms Relating to Price**

72. The collusion among Yardi and the Landlords harms consumers in other ways relating to price. In a competitive market Landlords would meet tenant demand by offering leases with a range of durations because the Landlords would be uncertain whether a single short-term offering to each tenant—say, one year—would allow them to respond quickly enough to changing economic conditions. Yet, the certainty that Yardi's pricing "transparency" brings to Landlords—meaning accurate and timely knowledge of what their competitors are doing—makes longer-term leases unnecessary because the Landlords know that Yardi will be able to track changing pricing across their market in real time. Landlords know that, unlike in a competitive market, they will not be blindsided by sudden pricing changes by their competitors.

73. Amanda Smeltzer, executive director at Landlord Banyan Living, succinctly articulated this dynamic. The certainty Yardi offered allowed Banyan "to find structure and stability in our GPR, versus making our best guess at what it

---

[33] https://www.businesswire.com/news/home/20160621005024/en/Rockbridge-Group-Increases-Rent-Revenue-Yardi-RENTmaximizer

should be."[34] "GPR" is gross potential rent, meaning the hypothetical revenue a Landlord could earn if its units were fully rented throughout a particular year at market rents. A Landlord typically must estimate its GPR because it does not know what its competitors will charge and on what terms. Coordination enabled by Yardi eliminates those uncertainties, allowing Landlords to calculate their GPR precisely. This eliminates the need for Landlords to offer more favorable terms to renters.

74. For this reason, Banyan moved from offering renters a range of lease-terms to offering only short-term leases that allowed Banyan to take advantage of short-term price movements in a particular Apartment Market: "Prior to RENTmaximizer, we hesitated to offer short-term leases. Now we confidently offer them for both new and renewal leases. As a result, we've seen positive rent growth."[35] Leases typically restrict price increases during a lease-term, but by forcing more frequent lease renewals, short-term leases allow Landlords to increase rents more frequently.

75. Moreover, Yardi's admitted ability to restrict output—*i.e.*, limit the availability of units to maintain artificially high lease prices—protects Landlords from the problems short-term leases might otherwise pose when real estate markets are declining. As Yardi says, Defendants' unlawful price-fixing scheme maintains occupancy rates by manipulating inventories of available units. This maintains prices even in down real estate markets.

76. This goes a long way to explaining what has happened in the market generally. BLS reports that leases of longer than one year have virtually disappeared. Of all leases between January and June 2022, less than 9% were longer than one year. And even one-year leases become less common the longer a tenant lives in an Apartment. The BLS reports that of the tenants who lived in the same unit for five

---

[34] https://www.businesswire.com/news/home/20161213005313/en/Banyan-Living-Achieves-Rent-Growth-Yardi-RENTmaximizer
[35] *Id.*

or more years, only 49.7% had a twelve-month lease, while 50.3% had month-to-month leases, meaning 0% (allowing for rounding) had leases for a period longer than twelve months.

77. The reason for favoring these shorter lease durations and increasing tenant churn is obvious—it allows Landlords to increase rents more frequently. The BLS reports that in the first half of 2022, the average percentage change in rent was 12% for new tenants, but only 3.5% for renewing tenants (*i.e.*, tenants who had a lease renewal within the previous six months).

78. Short-term leases are more profitable for Landlords, and Yardi-based price collusion has made short-term leases ubiquitous in Apartment Markets around the country.

**F.  "Plus Factors" Exclude the Possibility of Independent Action**

79. Several so-called "Plus Factors" enhance the vivid picture of collusion in Apartment Markets and tend to exclude the possibility that Defendants' actions were independent and motivated by an intent to compete.

80. *First*, the Landlords submit their competitively sensitive pricing data to Yardi knowing that all the Landlords are doing the same and that Yardi would use that data to coordinate leasing prices among the Landlords. That is the very essence of the Yardi contract with Landlords. This coordination is inconsistent with independent action motivated by an intent to compete, which would drive Landlords to zealously protect this competitively sensitive information from their competitors.

81. *Second*, the Landlords' agreement not to compete on price is against their self-interest in a competitive market. Landlords acting independently and motivated to compete for renters would use lower prices to entice renters and increase occupancy rates; that is the very essence of pricing in a competitive market. Thus, the Landlords' conduct is inconsistent with a conclusion that they are acting independently to compete more effectively.

82.     *Third*, Yardi actively creates and supports so-called User Groups made up of Landlords across the country that Yardi uses as conduits for refining and perfecting their unlawful collusion. Yardi's support of these User Groups and the Landlords' participation in the groups to further share competitively sensitive information is inconsistent with the Landlords acting unilaterally in competition with each other and is powerful evidence that the Defendants are coordinating and colluding, not competing. Yardi currently supports User Groups in Arizona, Atlanta, Central and South Texas, Chicago, Denver, Dallas, Hawaii, Minneapolis, Nebraska, Nevada, New England, New York, North Carolina, the Pacific Northwest, San Francisco, Toronto, and Washington, D.C.[36] Yardi has admitted that these User Groups "facilitate the exchange of information" among Landlords. According to Yardi these User Groups "provide[] a professional forum to exchange experience and ideas with peers . . . ."[37] To hide the effects of these User Groups, Yardi does not publish the identity of their members. Indeed, Yardi now hides the existence of the User Groups.

83.     *Fourth*, the high barriers to entry in the Apartment Markets make it easier for Defendants to form and maintain their unlawful conspiracy and their unlawful price-fixing agreement. The Landlords have little reason to worry that an upstart competitor will upset their unlawful pricing scheme because the barriers to entry discourage such competitors from entering the market. There are two reasons for this. First, the Yardi/Landlord price fixing raises the market prices for non-Yardi landlords, who are better off financially enjoying the benefits of that price fixing than challenging it. Second, a true new entrant would have to construct or take over enough units to have any effect on the price fixing, but once in the market would benefit from the scheme.

---

[36] https://web.archive.org/web/20230311055157/https://www.yardi.com/services/user-groups/
[37] *Id*.

84.   *Fifth*, the concentration among Landlords creates opportunities for collusion and communication. Virtually all the Landlord Defendants manage Apartments in multiple markets across the country. This substantial overlap of the Landlords' operations allows them to communicate efficiently and continuously about their unlawful pricing scheme across multiple Apartment Markets. That opportunity to communicate is an opportunity to collude, to coordinate their actions, and to police the terms of the unlawful price-fixing scheme.

## V.   MARKET DEFINITION AND YARDI'S MARKET POWER

85.   The relevant product market is the market in which Landlords use Yardi services: the leasing of what Yardi itself defines as Mid-Range and High-End Apartments.

86.   Yardi sets these segments apart on its website as distinct segments within the multifamily residential space and it rates Apartments within these segments from A+ to B-.[38] Mid-Range Apartments cater to working professionals, such as two-income couples, police officers, firefighters, teachers, and technical workers. High-End Apartments cater to discretionary renters, such as households with more income but without wealth and households capable of owning a residence, but who choose to rent.[39]

87.   Renters of these Apartments do not consider purchasing housing as a reasonable substitute for renting Apartments primarily because of the down payment needed to purchase long-term housing and the need to occupy the housing for a long period of time to make the initial down payment economically worthwhile. In addition, renters of these Apartments value the convenience of renting housing over the responsibility for maintaining that housing.

---

[38]   https://www.yardimatrix.com/About-Us/Our-Methods/How-We-Define-The-Apartment-Supply/Property-Ratings
[39]   https://www.yardimatrix.com/About-Us/Our-Methods/How-We-Define-The-Apartment-Rental-Market

88.     The relevant geographic markets are no larger than the Metropolitan Statistical Areas ("MSAs") as defined by the United States Bureau of Statistics, within which Yardi provides its relevant services to Landlords of Mid-Range and High-End Apartments.

89.     As Yardi has asserted in its marketing materials: Each such geographic market corresponds to an MSA. Within each MSA the geographic market may be further defined within a micro to a macro range. At its smallest, the geographic market may be limited to a radius extending from one to five miles surrounding a particular property. The geographic market may also be defined according to properties within a zip code or combination of zip codes.[40]

90.     Yardi has market power within these Apartment Markets. The direct evidence of this market power is Yardi's admitted and proven ability to raise price *and* restrict output. Yardi has admitted that it can increase rental prices within these markets by 6% or more. Yardi also has admitted that it can manage a Landlord's inventory to maximize the Landlord's revenue, even if that means keeping units off the market to maintain the price of other units.

91.     This ability to increase price *and* reduce output is direct evidence of Defendants' market power and no further allegations regarding proxies for the Defendants' market power are necessary.

92.     In any event, Plaintiffs' allegations of the relevant markets and Defendants' market power within those markets are sufficient even when Plaintiffs employ indirect evidence. Yardi has admitted that Defendants can increase lease prices by at least 6% without reducing occupancy rates. This admission satisfies the so-called SSNIP test, which asks whether a monopolist may profitably impose a hypothetical small, but significant, non-transitory price increase without causing a reduction in revenue that renders the increase unprofitable. The SSNIP test normally

---

[40] *Id.*

COMPLAINT

assumes a hypothetical price increase of 5%. If hypothetical price increase is profitable, the plaintiff has defined the market properly.

93.    Here, the price increase is not hypothetical, but actual and admitted. Defendants have asserted that they have profitably increased lease prices by at least 6%—*i.e.*, without decreasing occupancy rates that would make the price increase unprofitable. Because Defendants have acknowledged that their 6% price increases have not decreased revenues in a way that has rendered the increases unprofitable, Plaintiffs' allegations satisfy the SSNIP test, and they have properly defined the relevant market.

94.    The fact that the Defendants' price increases are real and not hypothetical and that they satisfy the SSNIP test is perhaps the single most significant accomplishments of their illegal collusion: without changing ownership of any of the Landlords the Defendants have gained the market power and the resulting pricing power that they could have accomplished otherwise only by a merger of all the Landlords. That merger would be unlawful because it would give the merged Landlord power to raise price 6%. It cannot be lawful then for the Defendants to have accomplished by agreement—the simple but powerful agreement to outsource their pricing to a single decision maker—what they would be prohibited from accomplishing by merger.

95.    What is more, Yardi has admitted that "its customers represent roughly 50% of the US multifamily market."[41] Given that the multifamily market encompasses far more than the Mid-Range and High-End segments to which Plaintiffs' market definition is limited, Yardi's market share in the Apartment Markets is far higher than 50%. This is more than sufficient to satisfy the minimum market share required to suggest that the Defendants possess market power. And when combined with Yardi's admitted power to raise price and reduce output,

---

[41] https://resources.yardi.com/documents/pere-keynote-interview-creating-efficiency-in-u-s-multifamily/

- 29 -
COMPLAINT

Plaintiffs' market share allegation would be sufficient to satisfy Plaintiffs' initial burden of establishing their *prima facie* case.

## VI.   CLASS ACTION ALLEGATIONS

96.   Pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and 23(b)(3), Plaintiffs bring this action for themselves and on behalf of the following Class:

> All persons or entities in the United States that leased Mid-Range or High-End Apartment units from a Landlord that used Yardi's RENTmaximizer services at any time beginning September 8, 2019, until the anticompetitive acts end.

97.   Plaintiffs and the members of the Class are seeking damages and an injunction to remedy Defendants' violations alleged herein.

98.   The Class is readily ascertainable, and the members of the Class are readily identifiable from information and records maintained by Defendants.

99.   Members of the Class are so numerous that joinder of all members is impracticable.  The members of the Class are numerous and widely dispersed throughout the United States.

100.   Plaintiffs' claims are typical of the claims of the members of the Class. Within the Class, Plaintiffs' interests are not antagonistic to the claims of the other members of the Class, and there are no material conflicts with any other members of the Class that would make class certification inappropriate. Plaintiffs and all members of the Class were damaged by the same wrongful conduct of Defendants.

101.   Plaintiffs will fairly and adequately protect and represent the interests of the members of the Class. The interests of the Plaintiffs are coincident with, and not antagonistic to, those of the members of the Class.

102.   Plaintiffs are represented by counsel (Competition Law Partners PLLC and Don Bivens PLLC) who are experienced and competent in the legal issues involved in this Complaint and in the prosecution of class action litigation.

103. Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members because Defendants have acted on grounds generally applicable to the entirety of the Class, thereby determining damages with respect to the Class as a whole is appropriate. Such generally applicable conduct is inherent in Defendants' wrongful conduct.

104. There are legal and factual questions common to the Class, which do not vary from Class member to Class member and which may be determined without reference to individual circumstances of any Class member. These include, but are not limited to, the following:

(a)     Whether a Class member's Landlord uses Yardi RENTmaximizer;

(b)     What is the appropriate measure of damages;

(c)     Whether the conduct alleged herein violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

(d)     Whether the Class is entitled to the injunctive relief sought.

105. Class action treatment is a superior method to other available methods for the fair and efficient adjudication of the controversy. The prosecution of separate actions by individual members of the Class would impose heavy burdens on the courts and Defendants and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. Class action treatment will permit many similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh any potential difficulties in management of this class action.

106. Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## VII. CLAIMS FOR RELIEF

### First Claim for Relief

### (Conspiracy in Violation of Section 1 of the Sherman Act)
### (On Behalf of the Class Against All Defendants)

107. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

108. The Defendants conspired to unlawfully fix prices of the Landlords' leases in particular Apartment Markets. As part of this conspiracy, the Landlords agreed not to compete based on price. Defendants' unlawful price-fixing agreement raises the rental prices tenants pay and eliminates price competition among Landlords.

109. This price-fixing conspiracy is a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

110. Plaintiffs and members of the Class were harmed and are being harmed by Defendants' conduct because they were deprived and are being deprived of a competitive market in which to obtain the leasing of Apartment units, and as a result had to pay leasing fees that were and are unwarranted and unlawful.

111. Defendants' conduct was and is a substantial factor in causing Plaintiffs' harm.

## Second Claim for Relief

### (Unlawful Agreement in Violation of Section 1 of the Sherman Act)

### (On Behalf of the Class Against All Defendants)

112.   Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

113.   The Defendants entered an unlawful price-fixing agreement. The Landlords provided Yardi with competitively sensitive price information, which Yardi used to set prices among the Landlords in particular Apartment Markets. As part of the unlawful conspiracy, the Landlords agreed not to compete based on price. Defendants' unlawful agreement raises the rental prices tenants pay and eliminates price competition among Landlords.

114.   The agreement is an unreasonable restraint of trade in violation of Section 1, 15 U.S.C. § 1.

115.   The purpose and effect of this agreement was to restrain competition in Apartment Markets.

116.   Plaintiffs and members of the Class were harmed and are being harmed by Defendants' conduct because they were deprived and are being deprived of a competitive market in which to obtain the leasing of Apartment units, and as a result had to pay leasing fees that were and are unwarranted and unlawful.

117.   There is no procompetitive justification for Defendants' unlawful conduct. Even if, contrary to fact, there were assumed to be a procompetitive justification, the unlawful conduct was not necessary to achieve any such procompetitive purpose, which could have been realized by less restrictive alternatives, and the anticompetitive effects of Defendants' conduct have far outweighed the procompetitive benefits.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs seek the following relief:

a.      An order declaring that Defendants have engaged in anticompetitive conduct in violation of Section 1 of the Sherman Act;

b.      An order declaring that this action may proceed as a class action on behalf of the Class;

c.      An injunction permanently enjoining and restraining Defendants from continuing the unlawful conduct under Section 16 of the Clayton Act, 15 U.S.C. § 26;

d.      A judgment awarding Plaintiffs actual damages trebled (*i.e.*, three times the amount by which the Defendants' actions increased the rent Plaintiffs paid), in an amount to be determined at trial;

e.      A judgment awarding attorneys' fees and costs of suit;

f.      A judgment awarding all available pre-judgment and post-judgment interest, to the fullest extent available under law or equity; and

g.      An order or judgment awarding such other further relief as allowed by law.

## **JURY DEMAND**

Plaintiffs request a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

Dated: March 22, 2024

*/s/ Leiv Blad*
Leiv Blad (Bar. No. 151353)
Jeffrey Blumenfeld (*pro hac vice forthcoming*)
Meg Slachetka (*pro hac vice forthcoming*)
COMPETITION LAW PARTNERS PLLC
1101 Pennsylvania Avenue, NW
Washington, DC  20004
Telephone: (202) 742-4300
Facsimile: (202) 810-9815

Don Bivens
don@donbivens.com
Teresita Mercado
teresita@donbivens.com
Don Bivens PLLC
15169 N. Scottsdale Road
Suite 205
Scottsdale, AZ 85254
Telephone: (602) 708-1450

*Attorneys for Plaintiffs*

COMPLAINT